IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

U.S. SECURITIES AND EXCHANGE COMMISSION,
100 F Street, NE
Washington, DC  20549,

*Plaintiff*,

-v-

PFIZER INC.,
235 East 42nd Street
New York, NY  10017,

*Defendant*.

---

**COMPLAINT**

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges:

**<u>SUMMARY</u>**

1.     This action arises from violations of the books and records and internal controls provisions of the Foreign Corrupt Practices Act of 1977 ("the FCPA") by Defendant Pfizer Inc. ("Pfizer"), relating to improper payments made to foreign officials in numerous countries by the employees and agents of Pfizer's subsidiaries in order to assist Pfizer in obtaining or retaining business.

2.     At various times from at least 2001 through 2007, employees and agents of subsidiaries of Pfizer, conducting business in Bulgaria, China, Croatia, Czech Republic, Italy, Kazakhstan, Russia, and Serbia, engaged in transactions for the purpose of improperly influencing foreign officials, including doctors and other healthcare professionals employed by

foreign governments.  These improper payments were variously made to influence regulatory and formulary approvals, purchase decisions, prescription decisions, and to clear customs. Employees in each of the involved subsidiaries attempted to conceal the true nature of the transactions by improperly recording the transactions on the books and records of the respective subsidiaries.  Examples included falsely recording the payments as legitimate expenses for promotional activities, marketing, training, travel and entertainment, clinical trials, freight, conferences and advertising.

3.      These improper payments were made without the knowledge or approval of officers or employees of Pfizer, but the inaccurate books and records of Pfizer's subsidiaries were consolidated in the financial reports of Pfizer, and Pfizer failed to devise and maintain an appropriate system of internal accounting controls.

4.      As a result of this conduct, Pfizer violated Section 13(b)(2)(A) of the Securities Exchange Act of 1934 ("Exchange Act") by failing to make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and disposition of assets of the issuer.  Additionally, by failing to ensure that it maintained adequate internal controls to detect and prevent FCPA violations, Pfizer violated Section 13(b)(2)(B) of the Exchange Act, as it failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:  (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements; (iii) transactions are recorded as necessary to maintain accountability for assets; and (iv) that access to assets is permitted only in accordance with management's general or specific authorization.

5.      Pfizer made an initial voluntary disclosure of certain of these issues to the

Commission and Department of Justice in October 2004, and thereafter diligently and thoroughly

undertook a global internal investigation of its operations in no less than 19 countries, which

identified additional potential violations, and regularly reported on the results of these

investigations and fully cooperated with the staff of the Commission.  Pfizer also undertook a

comprehensive compliance review of its operations, enhanced its internal controls and

compliance functions, engaged in significant disciplinary measures, and developed and

implemented global FCPA compliance procedures, including the development and

implementation of innovative proactive procedures, and sophisticated supporting systems.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and

27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7.      Venue in this District is proper pursuant to Section 27 of the Exchange Act [15

U.S.C. § 78aa] or 28 U.S.C. § 1391(d).

## DEFENDANTS

8.      **Pfizer Inc. ("Pfizer")** is a global pharmaceutical company that discovers,

develops, manufactures and markets prescription medicines for humans and animals.  Pfizer is

incorporated in the State of Delaware and is headquartered in New York, New York.  Its

securities are registered with the Commission under Section 12(b) of the Exchange Act, and its

common stock trades on the New York Stock Exchange under the symbol "PFE."  Pfizer

conducts worldwide operations in over 180 countries, employing more than 100,000 people.

## OTHER RELEVANT ENTITIES

9.      **Pfizer Italia S.r.l.** is an Italian limited liability company and indirect wholly-owned subsidiary of Pfizer.

10.     **Pfizer Investment Co. LTD** is a Chinese company and indirect majority-owned subsidiary of Pfizer.

11.     **Pfizer spol. s.r.o.** is a Czech company and indirect wholly-owned subsidiary of Pfizer.

12.     **Pfizer H.C.P. Corporation** ("Pfizer HCP") is a New York Corporation and an indirect wholly-owned subsidiary of Pfizer.  During the relevant period, Pfizer HCP operated in several international markets through representative offices, including offices in Bulgaria, Croatia, Kazakhstan and Serbia, as well as through contracts with Russian distributors and employees of its parent company who worked in a Pfizer representative office in Moscow.

13.     **Pharmacia Corporation** ("Pharmacia") was a multinational pharmaceutical company acquired by Pfizer on April 16, 2003 in a stock-for-stock transaction.  Its international operations were combined with Pfizer's, including operations in Russia, Kazakhstan, Bulgaria, Serbia and Croatia, which were thereafter restructured and incorporated into Pfizer HCP.

## FACTUAL ALLEGATIONS

14.     The manufacture, registration, distribution, sale, and prescription of pharmaceuticals are highly-regulated activities throughout the world.  While there are multinational regulatory schemes, it is typical that each country establishes its own regulatory structure at a local, regional, and/or national level.  These regulatory structures generally require the registration of pharmaceuticals and regulate labeling and advertising.  Additionally, in certain countries the government establishes lists of pharmaceuticals that are approved for government reimbursement or otherwise determines those pharmaceuticals that may be purchased by

government institutions.  Moreover, countries often regulate the interactions between pharmaceutical companies and hospitals, pharmacies, and healthcare professionals.

15.     In those countries with national healthcare systems, hospitals, clinics, pharmacies, doctors, and other healthcare professionals and institutions are generally government officials or instrumentalities within the meaning of the FCPA.

16.     During the relevant period, for the purpose of improperly influencing foreign officials in connection with regulatory and formulary approvals, purchase decisions, prescription decisions, and customs clearance, employees of Pfizer's subsidiaries made and authorized the making of payments of cash and the provision of other things of value both directly and through third parties.  Funds for these payments were often generated by the subsidiaries' employees through the use of collusive vendors, such as travel agents or restaurants, to create fraudulent invoices.

**A.**     **Pfizer HCP Bulgaria**

17.     During the relevant period, Pfizer products were marketed in the Republic of Bulgaria through a representative office of Pfizer HCP ("Pfizer HCP Bulgaria").

18.     From 1999 and continuing into 2005, Pfizer HCP Bulgaria, through its employees and agents in Bulgaria, paid for domestic and international travel and provided equipment to government-employed doctors.  These payments were intended to influence these government officials to prescribe Pfizer products.

19.     Between 1999 and 2003, Pfizer HCP Bulgaria organized "Incentive Trips" to destinations in Greece that were attended by Pfizer HCP Bulgaria sales representatives and Bulgarian healthcare providers.  Incentive Trips typically lasted three days and included both educational training and hospitality and entertainment.  Pfizer HCP Bulgaria sales representatives were instructed to reach agreements with doctors on the specific quantities of

Pfizer pharmaceuticals they would prescribe in return for participation in these events. Pfizer HCP Bulgaria employees also offered to support doctors' travel to medical conferences in exchange for promises to use Pfizer's products.

20.     Pfizer HCP Bulgaria employees took steps to conceal the true nature of these transactions by inaccurately recording the transactions as payments for educational or charitable support.

**B.     Pfizer China**

21.     During the relevant period, Pfizer's pharmaceutical products were promoted in the People's Republic of China by Pfizer's subsidiary based in Beijing, Pfizer Investment Co. LTD ("Pfizer China").

22.     From at least 2003 through 2007, Pfizer China, through its employees and agents, provided cash payments, hospitality, gifts, and support for international travel to doctors employed by Chinese government healthcare institutions. The payments of cash and other things of value were intended to influence these government officials to prescribe Pfizer products, provide hospital formulary listing, and otherwise use their influence to grant Pfizer China an unfair advantage.

23.     Pfizer China employees provided these improper payments in recognition of past product sales or prescriptions, as incentives to prescribe or purchase Pfizer products in the future, or upon the basis of Pfizer China employees' assessments of the doctors' potential prescribing levels.

24.     To facilitate the payment of rewards and incentives, Pfizer China employees organized meetings with Chinese government doctors that were marketed as "clubs" or "high-prescribing doctors" programs. Invitations to such events were provided to doctors in recognition of past product sales or prescriptions, or as incentives to prescribe or purchase Pfizer

products in the future.  In some cases, meeting agendas included only minimal professional content and extensive recreational and entertainment activities.

25.     Pfizer China also created various "point programs," under which government doctors could accumulate points based upon the number of Pfizer prescriptions they had written. The points could be redeemed for various gifts, some of which were related to the practice of medicine (*e.g.*, medical books), but others that were gifts of a personal nature (*e.g.*, cell phones, tea sets, and reading glasses).

26.     Pfizer China employees offered and provided financial and other support for Chinese doctors to attend domestic and international conferences in return for explicit agreements to prescribe, purchase, or recommend Pfizer products.  For example, in March 2006, a Pfizer China marketing manager explained to his regional sales manager that Pfizer China would only offer to support travel to a conference in Australia for two doctors if they promised to "use no less than 4,200 injections a year" and to prescribe a Pfizer product to "more than 80%" of their patients.

27.     Pfizer China employees also offered and provided small cash payments in order to influence doctors to prescribe Pfizer products.  These payments were directly linked to the volume of Pfizer products prescribed by those doctors.

28.     Pfizer China employees took steps to conceal the true nature of the cash payments, gifts, and travel support made to Chinese government doctors by failing to accurately record the transactions.

**C.     Pfizer HCP Croatia**

29.     During the relevant period, Pfizer products were marketed in the Republic of Croatia through a representative office of Pfizer HCP ("Pfizer HCP Croatia").  Prior to the 2003

merger with Pfizer, Pharmacia also operated a representative office in Croatia ("Pharmacia Croatia").

30.     From at least 1997 and continuing to late 2004, Pfizer HCP Croatia, Pharmacia Croatia, and their employees and agents in Croatia made payments and provided benefits to doctors employed by the Croatian government.  The payments of cash and other things of value were intended to influence these government officials to prescribe Pharmacia and Pfizer products and to provide regulatory approvals for Pharmacia and Pfizer products.

31.     From February 1997 until May 2003, Pharmacia Croatia made monthly payments of approximately $1,200 per month to the Austrian bank account of a doctor who served as a member of several Croatian government committees that oversaw the registration and reimbursement of pharmaceutical products.  A memorandum prepared in April 1997 by a senior Pharmacia Croatia manager stated that the Croatian doctor was expected to ensure that all of Pharmacia's products were approved for registration and reimbursement by the relevant committees and noted that "as he is a member of the Registration Committee regarding pharmaceuticals, I do expect that all products which are to be registered, will pass the regular procedure by his assistance. . . .  He is a person of great influence in Croatia in the area of pharmaceuticals, and his opinion is respected very much; that's the reason he is so important to us."

32.     Pharmacia Croatia continued to make the payments to the Croatian doctor until the Pharmacia/Pfizer merger in early 2003.  After the merger, Pfizer HCP Croatia made three separate payments in or around April, May, and July 2003.  During this period, the committees on which the doctor served approved three Pfizer products.  No further payments were made to the doctor after July 2003.

33.     Pharmacia Croatia also made payments and provided benefits under a "Bonus Program" to Croatian doctors who were employed in senior positions in Croatian government healthcare institutions.  Under the Bonus Program, once a doctor agreed to use Pharmacia's products, a percentage of the value of Pharmacia products purchased by a doctor's institution would be given back to the doctor in the form of cash payments, international travel support, donations of durable goods, or free products.

34.     Although Pfizer HCP Croatia ended the majority of the Bonus Program payments after the 2003 merger, it permitted the program to continue with respect to one Pharmacia product until 2005.  For example, a Pfizer HCP Croatia sales representative wrote to her manager in early 2004 recommending that Pfizer enter into bonus agreements "tied to specific sales" and explaining that she had entered into a bonus agreement with a senior doctor in the past and that "the increase in sales of [a Pharmacia product] was immediately evident."  Based on this recommendation, Pfizer HCP Croatia authorized the employee to enter into an unwritten 12% bonus agreement with the doctor, paid the expenses and hotel accommodations of the doctor and his colleagues to attend a conference in Lisbon, and purchased a television that was to be used in the doctor's office.

35.     Pfizer HCP Croatia employees took steps to conceal the true nature of these transactions and failed to accurately record these transactions by falsely booking them as "Conventions," "Gifts," and "Professional Services – Non Consultant" expenses, among other false and misleading descriptions.

**D.    Pfizer Czech**

36.     During the relevant period, in the Czech Republic, Pfizer's pharmaceutical products were marketed and sold through Pfizer's subsidiary, Pfizer spol. s.r.o. ("Pfizer Czech").

37.     From at least 2003 and through 2004, Pfizer Czech, through its employees and agents, provided support for international travel and recreational opportunities to doctors employed by the Czech government with the intent to influence these government officials to prescribe Pfizer products.

38.     For example, in October 2004, Pfizer Czech paid for a group of Czech government-employed doctors and pharmacists to visit a Pfizer manufacturing facility in Perth, Australia.  In connection with the site visit, Pfizer Czech provided sightseeing opportunities for the government doctors, including layovers in Hong Kong, visits to Australian landmarks, and additional free time in Australia at the end of the program.  At least one of the attending doctors participated in meetings of a committee that advises the Czech Ministry of Health on drug reimbursement issues.

39.     Similarly, from 2003 through 2004, Pfizer Czech organized and sponsored approximately 10 "educational weekends" that approximately 920 healthcare professionals attended, including doctors employed by the Czech government.  The events were held at resort destinations, including ski resorts in Austria and Slovakia, usually over a three-day period.  The events typically included skiing or other recreational activities for the majority of the weekend, and had little legitimate promotional or educational content.

40.     Pfizer Czech employees took steps to conceal the true nature of these transactions, and failed to accurately record these transactions by falsely booking them as "Conventions and Trade Meeting," among other false and misleading descriptions.

**E.     Pfizer Italy**

41.     During the relevant period, Pfizer products were marketed and sold in the Republic of Italy through Pfizer's subsidiary, Pfizer Italia S.r.l ("Pfizer Italy").

42.     From at least 2001 and continuing through early 2004, Pfizer Italy provided, directly or through vendors, cash payments, gifts, support for domestic and international travel, and other benefits to doctors employed by Italian government healthcare institutions.  The payments of cash and other things of value were intended to influence these government officials to prescribe Pfizer products.

43.     For example, from at least 1996 through 2003, Pfizer Italy engaged third parties to run observational studies conducted by doctors employed by Italian government healthcare institutions, purportedly to obtain research and marketing information from Italian doctors.  In reality, many of the "observational studies" lacked scientific value and were instead designed to improperly influence Italian government doctors to prescribe Pfizer products.  Medical personnel were not solely responsible for selecting the doctors to participate, but instead, Pfizer Italy sales personnel selected doctors to participate based on the doctors' agreement to prescribe Pfizer products at specific levels.  The Pfizer sales personnel directed cash payments, gifts and other benefits to the doctors, and monitored the performance of the doctors to ensure that the agreed-upon prescription levels were met.

44.     From at least 2000 to 2003, Pfizer Italy employees also made direct cash payments (ostensibly honoraria and lecture fees), provided goods (*e.g.*, televisions, monitors, mobile telephones, photocopiers, printers), and improper travel sponsorship (*e.g.*, "weekend in European capital," "weekend in Gallipoli," "weekend with companion," "weekend in Rome") in return for promises by doctors to recommend or prescribe Pfizer's products.

45.     Pfizer Italy employees took steps to conceal the true nature of these transactions and failed to accurately record these transactions by falsely booking them as "Marketing Expenses," "Professional Training," and "Advertising in Scientific Journals," among other false and misleading descriptions.

F.    **Pfizer HCP Kazakhstan**

46.    During the relevant period, Pfizer products were marketed in the Republic of Kazakhstan through a representative office of Pfizer HCP ("Pfizer HCP Kazakhstan").

47.    In 2000, Pfizer HCP Kazakhstan applied to the Kazakh government for approval of the registration of a Pfizer product for sale in Kazakhstan. At about the same time, two representatives of Company A, a Kazakh company, approached Pfizer's Regional Manager for the Central Asia and Caucasus region at a pharmaceuticals conference in Tashkent, Uzbekistan and requested an exclusive distributorship of the Pfizer product. When the Regional Manager informed Company A's representatives that Pfizer policy prohibited exclusive arrangements, the representatives stated that if Company A did not receive the exclusive distributorship, Pfizer HCP Kazakhstan would be unable to sell the Pfizer product in Kazakhstan.

48.    Following this meeting, Pfizer HCP Kazakhstan experienced substantial difficulty obtaining approval of its registration, including receiving numerous requests for additional documentation and clinical trial data. Despite Pfizer HCP Kazakhstan's compliance with these requests, the Kazakh government did not grant approval. The Regional Manager explained the situation to his supervisor and indicated in contemporaneous internal correspondence that he believed that Company A was associated with senior Kazakh government officials.

49.    Company A subsequently contacted the Regional Manager and again demanded an exclusive distributorship. In May 2000, Pfizer HCP Kazakhstan executed a written distribution agreement for the Pfizer product with Company A, and the Regional Manager verbally agreed with Company A that this relationship would be exclusive. Pfizer HCP Kazakhstan and Company A later entered into two other distribution agreements.

50.    Pfizer HCP Kazakhstan granted Company A the distributorship in order to improperly obtain approval for the registration of the Pfizer product in Kazakhstan. Soon after

the May 2000 agreement was reached, the Kazakh government approved a three-year registration for the Pfizer product.

51.     During the period in which Company A had an exclusive arrangement for the Pfizer product, sales were lower than projected.  As a result, in early 2003, Pfizer HCP Kazakhstan, without objection from Company A, terminated the exclusive relationship and entered into agreements with two other distributors.

52.     In September 2003, Pfizer HCP Kazakhstan was required to renew its registration for the Pfizer product with the Kazakh government, and Pfizer HCP Kazakhstan again encountered difficulties obtaining approval.  Company A again offered to help and sought an exclusive distributorship.  Pfizer HCP Kazakhstan did not grant Company A an exclusive distributorship in 2003, but did sign an additional contract and maintained a non-exclusive distributor relationship through mid-2005 believing that some of the profits from Company A would be provided to senior Kazakh government officials for their assistance in obtaining registration.

53.     The Kazakh government approved the renewal of the registration for the Pfizer product for sale in Kazakhstan near in time to when Pfizer HCP Kazakhstan signed the additional contract with Company A.

**G.      Pfizer Russia**

54.     During the relevant period, in the Russian Federation, Pfizer's pharmaceutical products were imported and distributed by Russian wholesalers who contracted directly with Pfizer HCP, and were marketed by employees of a Pfizer representative office located in Moscow ("Pfizer Russia").  Prior to its acquisition, Pharmacia also operated a representative office in Russia ("Pharmacia Russia").

55.     From at least 2000 and through 2005, Pfizer Russia, through its employees and agents, provided cash payments, gifts, support for domestic and international travel, and donations to doctors employed by the Russian government and other government officials.  The payments of cash and other benefits were intended to obtain regulatory approvals relating to Pfizer products, to avoid delays and penalties associated with the importation of certain Pfizer products, and to influence the doctors to prescribe Pfizer products.

**"Hospital Program" Payments**

56.     From as early as the mid-1990s through 2005, Pfizer Russia engaged in a sales initiative referred to as the "Hospital Program."  Under this program, Pfizer Russia employees were permitted to provide payments to hospitals of 5% of the value of certain Pfizer products purchased by the hospitals as price discounts or in-kind benefits to hospitals for their purchases.  In practice, some Hospital Program payments were made directly to or for the benefit of individual Russian doctors to reward past purchases and prescriptions and induce future purchases and prescriptions of Pfizer products.

57.     In addition to direct payments, Pfizer Russia also made Hospital Program payments through intermediary companies.  In some cases the intermediary companies were identified by the recipient doctors, and in other cases they were selected by Pfizer Russia employees.

58.     Employees of Pfizer Russia obtained cash for the Hospital Program payments with the assistance of collusive vendors who provided the cash to Pfizer Russia employees after receiving payment on the basis of false invoices.  Pfizer Russia employees would then use the cash to make payments to doctors to reward past purchases and prescriptions and induce future purchases and prescriptions of Pfizer products.

59.     The then-finance director of Pfizer Russia established two account codes in the company's General Ledger and instructed employees to book all their Hospital Program payments to this account, including improper payments.  From in or around December 2003 through 2005, Pfizer Russia booked approximately $820,000 in transactions to the two Hospital Program account codes.

**Distributor Discount Payments**

60.     A number of Pfizer Russia's distributors made cash payments, referred to as "discounts," to hospital administrators responsible for hospital purchasing decisions.  These payments were used to reward past purchases and induce future purchases.

61.     For example, in an email dated November 24, 2005, Pfizer Russia employees discussed the calculation of a "basic discount" of approximately $1,652, which was reportedly made by the distributor by providing cash in an envelope to a government doctor at the hospital in order to reward past purchases and induce future purchases.

**Improper Travel**

62.     Pfizer Russia employees sought to use conference attendance or travel to influence the inclusion of Pfizer products in tenders or on formulary lists, and to induce healthcare providers to prescribe or purchase Pfizer products.

63.     For example, on or about November 19, 2003 in an invoice cover letter, a Pfizer Russia employee requested "payment for the (motivational) trip of [the First Deputy Minister of Health] for the inclusion of [a Pfizer product] into the list . . . of medications refundable by the state" in order to influence the  First Deputy Minister of Health to add the Pfizer product to the regional formulary list.

64.     Similarly, on or about December 2, 2004, a Pfizer Russia employee requested sponsorship for a Moscow Department of Health employee who was assisting the chief

pharmacologist of a regional pediatric hospital in compiling algorithms for antibiotic therapy, and who wanted "to be financially compensated" for this work. The Pfizer Russia employee noted that, "in return for this," the pharmacologist "will include our products in the treatment algorithms." The treatment algorithms by the pharmacologist, a government official, constituted the official government-recommended treatment.

65.     Another example is an email dated June 27, 2005, in which a Pfizer Russia employee noted that a government doctor "should be assigned the task of stretching the amount of the purchases . . . to US $100 thousand" as an "obligation" in exchange for a trip to a conference in the Netherlands or Germany. Subsequently, on or about September 14, 2005, a Pfizer Russia employee emailed that an "agreement on cooperation" had been reached with the government doctor, and that Pfizer Russia's requirements were the "purchase quantities," and the doctor's requirement was "a trip to a conference."

66.     On or about September 8, 2003, a Pfizer Russia employee emailed colleagues regarding the request by a government doctor for sponsorship to attend a conference and noted that he "has pledged to prescribe at least 20 packs of [a Pfizer product] per month, and 20 packs [of another Pfizer product]."

**Customs Related Payments**

67.     During the relevant period, Russian Federation customs officials would not clear pharmaceutical products for importation unless the importer provided an official certification indicating that the products conformed to the specific terms of the product registration and packaging requirements filed by the manufacturer with the Ministry of Health. The Russian government licensed a private certification company (the "Certification Center") to perform this governmental function, which performed inspections and furnished the necessary certificates.

68.     In the spring of 2005, Pfizer Russia began to experience increasing difficulty in obtaining the necessary certificates because the Pfizer products did not conform to the precise terms of the product registration and packaging requirements filed with the Ministry of Health.

69.     On or about September or October 2005, a Certification Center employee proposed that the Certification Center would overlook the non-compliance of Pfizer Russia's products in exchange for monthly payments of approximately $3,000.  With the approval of the then-Pfizer Russia Country Manager, between October and December 2005 Pfizer Russia made payments of over $13,000 through an intermediary company, which then forwarded the payments to a company Pfizer Russia employees believed to be controlled by the Certification Center's employees.

70.     The customs clearing problems ceased after Pfizer Russia started making payments, but they resumed when Pfizer Russia stopped the payments in 2006 after Pfizer began a Corporate Compliance review in Russia.

**Use of Intermediaries to Make Payments**

71.     Pfizer Russia also used third-party intermediaries to make improper payments intended to increase the sales of pharmaceuticals.  This practice was known to and approved by senior leadership in Pfizer Russia, including the Country Manager and the Finance Director.

72.     For example, on or about April 7, 2004, a Pfizer Russia employee requested that a payment be made to a public official from Samara "who took an active part in getting [a Pfizer product] into the bidding."  This request was supported by two invoice cover letters.  The first was dated March 9, 2004, for 100,000 rubles (approximately $3,800) for "payment for the service of [an employee of the State Department of Samara Healthcare] for the purchase of [a Pfizer product]" in the Samara Region.  The second invoice cover letter was dated April 16, 2004, for a payment of approximately $4,500 for "hospital program for purchase of [a Pfizer

product] . . . to civil servant [] of health service of Samara," but was directed to an intermediary company used by Pfizer Russia to make improper payments to public officials.

73.     In or about October 2005, Pfizer Russia employees discussed how a regional distributor would provide Pfizer Russia with companies that have "neutral names," to which Pfizer Russia could make improper payments that would be booked as conferences to provide benefits to doctors.

**Offshore Payments of Sales Discounts**

74.     Pfizer Russia, through its employees and agents, continued and expanded a Pharmacia Russia practice of paying sales discounts owed to Russian distributors into offshore bank accounts. At least as early as 1999, Pharmacia Russia had entered into arrangements with one of its distributors by which sales discounts owed the distributor were paid into accounts of the distributor's shell companies located in Latvia and Cyprus.

75.     Pfizer Russia continued the practice of making payments to the distributor's Cyprus shell company following the 2003 merger with Pharmacia. In 2003 and 2004, Pfizer Russia management entered into similar arrangements for the benefit of two other Russian distributors that had set up shell companies in Canada and Hungary for this purpose.

76.     Pfizer Russia's management attempted to hide the true nature of the relationship with the Cyprus distributor from Pfizer HCP's regional management located in Germany. In 2003 and 2004, when regional managers questioned the Cyprus payments, Pfizer Russia's Country Manager claimed that the shell companies actually were providing lobbying services necessary to "gain access" to the Russian public sector tender market.

77.     Pfizer HCP's regional management did not verify that the Country Manager's explanation was accurate, nor did they follow up to understand how a third-party intermediary being paid outside Russia could lawfully help Pfizer Russia "gain access" to Russian government

tenders.  The practice continued through early 2005, when it was ended unilaterally by Pfizer

Russia (prior to Pfizer's commencement of an internal investigation in the market).

78.     Pfizer Russia employees took steps to conceal the true nature of these various

improper transactions, and failed to accurately record these transactions by booking them as

"Travel and Entertainment," "Convention and Trade Meetings," "Conferences," "Distribution

Freight," and "Clinical Grants/Clinical Trials," among other false and misleading descriptions.

**H.     Pfizer HCP Serbia**

79.     During the relevant period, Pfizer products were marketed in the Republic of

Serbia and Montenegro through a representative office of Pfizer HCP ("Pfizer HCP Serbia").

80.     Pfizer HCP Serbia, through one of its sales representatives, paid for a government

employed doctor to attend a conference in Chile in exchange for the doctor's agreement to

increase his department's purchases of Pfizer products.  Although Pfizer HCP Serbia

management discovered the improper agreement and terminated the responsible sales

representative, it still provided the support after the doctor threatened to spread negative

information about Pfizer's reputation as a company.

**I.     Accounting and Internal Controls**

81.     As described above, four Pfizer subsidiaries engaged in transactions in eight

countries which were intended to improperly influence foreign government officials in

connection with regulatory and formulary approvals, purchase decisions, prescription decisions,

and customs clearance.  Through the four subsidiaries, Pfizer earned aggregate profits of

$16,032,676 as a result of these improper transactions.

82.     As described above, during the relevant period the Pfizer subsidiaries recorded

transactions associated with the improper payments in a manner that did not accurately reflect

their true nature and purpose.  The false entries in the subsidiaries' books and records were

consolidated into the books and records of Pfizer, which reported the results of its subsidiaries' operations in its consolidated financial statements.

83.     As described above, during the relevant period Pfizer failed to devise and maintain an effective system of internal controls sufficient to prevent or detect the above-described conduct.

**J.     Remedial Efforts**

84.     Pfizer has taken extensive remedial actions including:  undertaking a comprehensive worldwide review of its compliance program; implementing enhanced anti-corruption compliance policies and procedures on a worldwide basis; developing global systems to support employee compliance with the enhanced procedures; adding FCPA-specific reviews to its internal audits; performing innovative and proactive anti-corruption compliance reviews in approximately 10 markets annually; and conducting comprehensive anti-corruption training throughout the organization.

**CLAIM FOR RELIEF**

**(Company Books and Records and Internal Controls)**

85.     Paragraphs 1 through 84 are realleged and incorporated herein by reference.

86.     Section 13(b)(2)(A) of the Exchange Act requires issuers to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets.

87.     Section 13(b)(2)(B) of the Exchange Act requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's general or specific authorization; transactions are recorded as necessary to permit preparation of financial statements in conformity

with generally accepted accounting principles or any other criteria applicable to such statements; transactions are recorded as necessary to maintain accountability for assets; and that access to assets is permitted only in accordance with management's general or specific authorization.

88.     By reason of the foregoing, Pfizer violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and (B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A.     Permanently enjoining Pfizer from violating, or aiding and abetting violations of, Sections 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)] and 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)] of the Exchange Act;

B.     Ordering Pfizer to disgorge all ill-gotten gains wrongfully obtained as a result of the illegal conduct described herein, plus prejudgment interest.

C.     Ordering Pfizer to periodically, at no less than 9-month intervals during a two-year term, report to the Commission the status of Pfizer's remediation and implementation of compliance measures.

Respectfully submitted,

Nancy Ellen Tyler (Texas Bar No. 20358600)
Kara N. Brockmeyer
Charles E. Cain
Michael K. Catoe

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC  20549
Telephone:   (202) 551-4193 (Tyler)
Facsimile:    (202) 772-9291 (Tyler)
E-mail:            tylern@sec.gov
                        brockmeyerk@sec.gov
                        cainc@sec.gov
                        catoem@sec.gov

Dated:  August 7, 2012